05-29

# EXHIBIT 1

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE,            )
                              )
v.                            ) No. 0504012348
                              )
RONALD D. JOHNSON,            )
            Defendant.        )


FRIDAY, APRIL 7, 2006


BEFORE:  HONORABLE FRED S. SILVERMAN, J


APPEARANCES:

   DEPARTMENT OF JUSTICE
   BY:  ANDREW VELLA, ESQ., Deputy Attorney General
        for the State

   RONALD D. JOHNSON, Pro Se
        Appearing Pro Se


TRANSCRIPT OF HEARING


- - - - - - - - - - - - - - - - - -
LYNNE BELL COALE
Registered Diplomate Reporter
Certified Realtime Reporter
SUPERIOR COURT REPORTERS
500 N. KING STREET    WILMINGTON, DELAWARE  19801
(302) 255-0562



```
                                                1
          IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
                  IN AND FOR NEW CASTLE COUNTY


  STATE OF DELAWARE,        )
                            )
  v.                        ) No. 0504012348
                            )
  RONALD D. JOHNSON,        )
                Defendant.  )


                    FRIDAY, APRIL 7, 2006

  BEFORE:  HONORABLE FRED S. SILVERMAN, J

  APPEARANCES:

       DEPARTMENT OF JUSTICE
       BY:  ANDREW VELLA, ESQ., Deputy Attorney General
             for the State

       RONALD D. JOHNSON, Pro Se
            Appearing Pro Se


                    TRANSCRIPT OF HEARING

                   - - - - - - - - - - - - -
                     LYNNE BELL COALE
                Registered Diplomate Reporter
                 Certified Realtime Reporter
                    SUPERIOR COURT REPORTERS
       500 N. KING STREET    WILMINGTON, DELAWARE  19801
                        (302) 255-0562
```

---

2

1  (Courtroom 6B, 12:00 noon.)
2          ---
3          THE COURT: Good afternoon.
4          MR. VELLA: Good afternoon, your Honor.
5          MR. JOHNSON: Good afternoon.
6          THE COURT: Stand by please for just a moment. I
7  have to look for the full file.
8          Mr. Johnson, when you were allowed to represent
9  yourself, do you recall whether you signed a Waiver of
10 Counsel form at that time, or did you just talk to a judge?
11         MR. JOHNSON: I -- I think I signed -- I signed
12 -- I did both. And there was never an attorney assigned to
13 represent me.
14         THE COURT: Actually, originally, Mr. Facciolo
15 was representing you.
16         MR. JOHNSON: Not Mr. -- we had a hearing on
17 that, and Mr. Facciolo came to the courtroom and told them
18 that he was never assigned. I never requested an attorney,
19 and I proceeded from Court of Common Pleas all the way up
20 into Superior Court. And any -- any -- any -- he -- he said
21 that -- that he was entered in error by -- by -- by -- by
22 them sending him information. They -- basically, this was
23 all impulse, just to decide to assign him as my attorney.

---

3

1  He never -- he never made it to -- to be my attorney because
2  I addressed issues to the Court.
3          THE COURT: All right. Well, so we're clear
4  about this, you understand that you have the right to have a
5  court-appointed attorney; is that not correct?
6          MR. JOHNSON: Your Honor, I'm well -- yeah, I'm
7  not having an attorney. We already -- I already had several
8  hearings regarding this issue. All the hearings have been
9  all about what they want to talk about, trying to get me an
10 attorney. And I've already refused, and I stand on my
11 constitutional right to represent myself.
12         THE COURT: Mr. Johnson, I'm not trying to
13 convince to you change your mind about that. Although it
14 was a bad idea then, and it's still a bad idea now, but I'm
15 not here to try to talk you out of it. I'm just trying to
16 make certain that the record is clear that you understand --
17 and I think that Judge Herlihy discussed this with you at
18 length at your final case review -- that you understand that
19 you have the right to an attorney and so on. And I'm not
20 going to repeat all of the things that Judge Herlihy would
21 have said back then.
22         The problem I'm having is, I can't find the
23 Waiver-of-Counsel form that you should have signed at the

---

4

1  time that Judge Herlihy allowed you to represent yourself.
2          MR. JOHNSON: If you have another one,
3  your Honor, it won't be no problem with me signing it.
4          THE COURT: And I'm in the process of -- now that
5  I've looked at the file, I'll send one down to you.
6          Let me speak to the State for a moment.
7          What are the maximums that Mr. Johnson is facing?
8          MR. VELLA: Let's see. I can tell the Court in a
9  second.
10         Unlawful imprisonment in the first degree and the
11 deadly weapon charge are the most --
12         THE COURT: Right, the others are one-year
13 offenses.
14         MR. VELLA: Actually, I know he's got a
15 person-prohibited charge. Everything else is actually one
16 year, one year, one year --
17         THE COURT: Is there a person-prohibited charge?
18         MR. VELLA: Yes, Count 3. Count 3, just let me
19 take a look.
20         THE COURT: Yes, that's right.
21         MR. VELLA: So, he facing two years maximum on
22 the unlawful imprisonment first degree, it's a Class G
23 felony, and the deadly weapon, I believe it's 25. Let me

## Page 5

1  make sure it's not 20.
2  THE COURT: How many years do you think you're
3  facing, Mr. Johnson?
4  MR. JOHNSON: It's -- that's irrelevant because I
5  never -- that's irrelevant because I never committed any
6  offense regarding the charges relating to possession of a
7  deadly weapon by a person prohibited.
8  THE COURT: Listen carefully to what I'm saying.
9  This is really important. One of the -- let me back up.
10  As you probably understand, the constitutional
11  right to represent yourself is very important, and the Court
12  honors that right, and the Court has allowed to you
13  represent yourself. You need to understand that there are a
14  few conditions to self-representation. There aren't many,
15  but there are a few.
16  One of them is that you can follow the Court's
17  rules and you can conduct yourself in a way that does not
18  interfere with having the case go forward. Do you
19  appreciate what I'm saying?
20  MR. JOHNSON: Yes, sir.
21  THE COURT: One of the ways that the Court can
22  tell whether you can actually do that, which is follow the
23  rules and not interfere with the process, is whether you can

## Page 6

1  answer a direct question or not.
2  Now, I did not ask you whether the amount of time
3  that you're facing is irrelevant. Actually, it is not
4  irrelevant because the law says that, before you can
5  represent yourself, you have to be told what the maximum
6  number of years is. You may not care what the maximum
7  number of years is.
8  MR. JOHNSON: I understand that. I understand
9  everything you're saying.
10  THE COURT: Let me finish, let me finish.
11  You may not care about that, but I have to ask
12  you the question. It's not irrelevant, and I have to get an
13  answer. And when I ask you, do you know how many years
14  you're facing, you can tell me either, "Yes, I know," or,
15  "No, I don't know, and then we can go from there. But if I
16  ask you how many years and you tell me that's irrelevant,
17  you're not answering my question. Do you follow me?
18  MR. JOHNSON: Yes, sir.
19  THE COURT: Do you know how many years you're
20  facing?
21  MR. JOHNSON: For that one charge, no, I don't.
22  THE COURT: All right, fine.
23  MR. JOHNSON: I assume it's like -- something

## Page 7

1  like anywhere from three to 20 years.
2  THE COURT: All right, that's fine. I'm not
3  asking you in order to get the right answer. I'm asking you
4  in order to get an understanding of how much you understand
5  about what you're going through. And if you don't know what
6  the maximum is, that tells me something.
7  Go ahead.
8  MR. VELLA: You Honor, I can just briefly give
9  the penalty ranges.
10  THE COURT: Please.
11  MR. VELLA: Unlawful imprisonment is a Class G
12  felony, zero to two years; possession of deadly weapon
13  during commission of a felony is Class B felony, two to
14  25 years, two being minimum-mandatory; possession of a
15  deadly weapon by a person prohibited -- in this case, it is
16  a knife -- Class F felony, zero to three years; offensive
17  touching of a law enforcement officer, there are one, two --
18  two of those charges, and those are a year each; the
19  resisting arrests, there are two of those charges, those a
20  year each, zero to one is the penalty. Menacing is an
21  unclassified misdemeanor, and that is zero to 30 days. And
22  the final offensive touching is straight-ahead offensive
23  touching, and that is also an unclassified misdemeanor which

## Page 8

1  will go from zero to 30 days.
2  So, those are the -- those are the penalties he
3  is potentially facing.
4  THE COURT: That's 34 years, 60 days.
5  MR. VELLA: That's what the state is calculating.
6  THE COURT: And a minimum of two years
7  minimum-mandatory on the firearms offense.
8  MR. VELLA: Correct, your Honor.
9  THE COURT: All right. So, Mr. Johnson, you can
10  just stay seated there for a moment.
11  You understand that the maximum imprisonment
12  you're facing, if you were convicted on all of these
13  charges, would be 34 years plus 60 days, and the minimum the
14  best you could hope for if you're convicted on that firearms
15  charge, is two years. You follow all that?
16  MR. JOHNSON: Yes, sir.
17  THE COURT: Okay. Then let me hand down the
18  Waiver of Counsel form. It's actually two pages now.
19  I take it from all of your pleading so far you
20  can read and write; is that right?
21  MR. JOHNSON: Yes, sir.
22  THE COURT: All right, thank you.
23  You understand Mr. Johnson, we all have people

9

1 that look over our shoulders, and if you're convicted, the
2 Supreme Court is going to be looking for this form. So, I
3 have to make certain, when they look for it, they find it.
4      Do you believe that you're competent to represent
5 yourself?
6      MR. JOHNSON: Yes, sir.
7      THE COURT: How far did you go in school?
8      MR. JOHNSON: I -- I stopped school at the 9th
9 grade. I attended school for about several years on and off
10 after that. Every time it came down to graduating and
11 things, I lost a job or something happened and, then, I
12 could not finish -- graduate from these programs. So, I'm,
13 like, stuck without a degree, but I have very much knowledge
14 as far as education.
15      THE COURT: All right. I'll mark on the form
16 that you went through 9th grade and I'll indicate that you
17 have additional education. All right?
18      MR. JOHNSON: Yes, sir.
19      THE COURT: Have you ever represented yourself in
20 a criminal trial before?
21      MR. JOHNSON: Yes, I represented myself on all of
22 them, practically, since about 20 years ago.
23      THE COURT: Roughly how many trials have you been

10

1 to on your own?
2      MR. JOHNSON: About 60.
3      THE COURT: You've actually --
4      MR. JOHNSON: Represented myself at 60 trials,
5 yes, I did your Honor.
6      THE COURT: What does the State make of that
7 contention?
8      MR. VELLA: Given his extensive criminal history,
9 from what I can see, he's gone to trial on just about
10 everything he's ever been arrested on. His criminal history
11 goes back well into the '80s.
12      THE COURT: So, in other words, his
13 representation of 60 self-representations may be correct.
14      MR. VELLA: It wouldn't surprise me.
15      THE COURT: All right. And out of those 60 times
16 that you represented yourself, Mr. Johnson, roughly how many
17 times can you recall standing in front of a 12-person jury,
18 giving an opening statement, roughly.
19      MR. JOHNSON: I went before the jury twice on
20 felony charges.
21      THE COURT: Two separate trials.
22      MR. JOHNSON: Yes, separate trials. Most of --
23 most of my charges have been misdemeanors, and they all was

11

1 handled by a judge in Superior Court here in Delaware. I
2 don't even think I have a Delaware conviction. I have many
3 arrests. I don't even -- I haven't even looked at it so
4 long to see, but I don't think I have any Delaware
5 convictions. And I probably been arrested in this court --
6 been in this court or -- yeah, in this court probably about
7 at least 20 -- 2 or so times.
8      THE COURT: All right. Concerning the two times
9 that you've actually represented yourself at a jury trial,
10 how did you do on them?
11      MR. JOHNSON: I won one and I lost one, which is
12 still under appeal. I didn't lose it because I wasn't
13 right. I lost it because I was biased and prejudiced. And
14 it's still under appeal and it's still being fought. That's
15 a federal offense charge of tax fraud that's still -- I'm
16 still fighting it, and that's why I'm on federal probation.
17      The case is still being appealed. I was
18 100 percent right. The judge, he didn't -- he didn't want
19 --
20      THE COURT: We're not -- I'm not talking about
21 that now. It doesn't matter for our purposes whether you
22 were right or wrong. I'm just trying to find out how much
23 experience you've had.

12

1      Roughly how long ago was it that you did your
2 last jury trial on your own, roughly?
3      MR. JOHNSON: Four years ago, three years ago.
4      THE COURT: So, that would be somewhere in the
5 2003 --
6      MR. JOHNSON: 2000 -- right around Christmastime,
7 close to 2002. I've been representing myself over 20 years.
8      THE COURT: When you did those last two jury
9 trials, at the time, were you in custody? In other words,
10 did you have to prepare for those trials while you were a
11 prisoner?
12      MR. JOHNSON: Yes.
13      THE COURT: All right. I'm mentioning that
14 because it is difficult enough, as I would think you'd
15 appreciate, to represent yourself on a good day. But if
16 you're a prisoner, it makes it even harder to represent
17 yourself because the Department of Correction does not bend
18 over backwards, as you understand, to accommodate inmates
19 who are trying to represent themselves. You see what I'm
20 getting at?
21      MR. JOHNSON: Yes, sir.
22      Your Honor, can I -- can I just speak up? I just
23 want to give my opinion about this, this case right here,

13

1  this particular case.
2     THE COURT: You'll have a chance, but this isn't
3  the time. And, again, I have to try and do this in an
4  orderly way so that we don't get confused about what we're
5  doing. Right now, I'm working through this Waiver of
6  Counsel form and the issues there. And I'm almost done, but
7  let me finish.
8     MR. JOHNSON: Would you like me to fill it out?
9     THE COURT: No, that's all right. We're okay.
10 Like I say, we're almost done. Stand by for a moment.
11    All right. And I think we've gone through
12 everything that has to be filled out that wasn't.
13    You read all 13 numbered sections of this form
14 carefully, and, then, you signed it?
15    MR. JOHNSON: No, I just signed it because it's a
16 Waiver of Counsel form, and I know I want to waiver counsel.
17    THE COURT: Well, I'm going to hand it back to
18 you. If you don't want to read it, then you can give it
19 back to the bailiff. But I strongly urge you to read this
20 form because you will be held accountable for it.
21    MR. JOHNSON: Can I get a copy of this?
22    THE COURT: Absolutely. In fact, I'll ask the
23 bailiff right now to separate the two pieces and give you

14

1  the copy. All right?
2     MR. JOHNSON: Yes, sir.
3     THE COURT: Now, I need to speak to the
4  prosecutor for one, two minutes tops. And, then, when I'm
5  done doing that, Mr. Johnson, you'll have an opportunity to
6  say the things that you want to say.
7     But first let me ask the State, as far as the
8  State understands it, I assume that the State knows that
9  there was a motion filed April 3 that's denominated "Filing
10 and Copy of Discovery that the State Provided the
11 Defendant," which what I have here is one page with
12 attachments.
13    Other than that motion, which I believe is
14 pending, from the -- and which I'll have to talk about that
15 in a few moments after Mr. Johnson has an opportunity to
16 speak -- what, if anything else, is pending as far as the
17 State knows?
18    MR. VELLA: Your Honor, as far as the State
19 knows, all other motions have been summarily denied.
20    THE COURT: All right.
21    MR. VELLA: And that's the only thing that's
22 outstanding.
23    Quite frankly, candidly, I don't have that

15

1  particular one in front of me. That may have not been -- I
2  remember receiving it. That might not have made it to my
3  file. If I can have an opportunity to take a look at it.
4     THE COURT: What I'll do while Mr. Johnson is
5  speaking, as he's asked to do, you'll take a look, please,
6  at that pending motion and, then, we'll talk about that.
7     MR. VELLA: Thank you.
8     THE COURT: Mr. Johnson, the reason why we're
9  actually here is, I'm trying to determine what things need
10 to be addressed before your trial on May 16 so that the
11 trial will begin promptly and it won't be confusing as to
12 what's going on on May 16. And I still have some things I
13 have to do concerning that. But if you would like to speak
14 about anything that is of concern to you relating to this
15 case, I'll give you five minutes to do that now. I have to
16 -- if it turns out that, five minutes from now, there are
17 things that we still need to talk about, then we'll
18 continue. But I'm willing to hear you for five minutes to
19 find out what is on your mind and, then, we'll see where we
20 have to go from there. But at the end of five minutes, I
21 may have to stop you and take care of the business that the
22 Court has to take care of.
23    So, please feel free to speak as you see fit on

16

1  this case for the next five minutes.
2     MR. JOHNSON: Your Honor, I'd like to give you a
3  copy of this here, this Supreme Court ruling, *Mapp v.* --
4  *Mapp v. Ohio.*
5     THE COURT: The bailiff will take your copy.
6     MR. JOHNSON: I don't have -- I was only able to
7  bring one copy. I need copies, one for you and the Attorney
8  General.
9     THE COURT: All right. Just give me a moment.
10 All I need to do is write down the citation for it. This is
11 *Mapp v. Ohio*?
12    MR. JOHNSON: Yes, sir.
13    THE COURT: Fine. Go ahead. We're returning the
14 case to you.
15    MR. JOHNSON: I don't have a very good copy of
16 this, but I'd like the Court to have a copy of this, if it's
17 not too hard. This is -- this is the fruit-of-the-
18 poisonous-tree doctrine, exclusionary rules -- exclusionary
19 rules, and other -- other authorities regarding suppression
20 of evidence illegally obtained by unlawful -- unlawful and
21 unconstitutional breaking and entrance without a warrant or
22 search warrant -- illegal search and seizure, more or less,
23 because the charges of the officers under the exclusionary

## 17

1  rule all came from illegal search and seizure, breaking in
2  my house without a warrant.
3      I have a copy of the officer's police report,
4  saying that he received false information to kick in my door
5  and that's how they got the officer's charges from illegal
6  search and seizure, by kicking in my door. They kicked in
7  my door without a warrant, without a search warrant, and
8  without probable cause. They could have -- they could have
9  went and got a search warrant, but they chose not to. And,
10 therefore, it led to four charges which -- which is two
11 resisting-arrest charges and two offensive-touching charges.
12     I'd like those four charges banned from the Court
13 because they was obtained by illegal search and seizure as
14 the law -- as the Supreme Court ruled in *Mapp v. Ohio*, and
15 that's the fruit-of-the-poisonous-tree doctrine dictating as
16 the exclusionary rule dictates.
17     I'd like -- I'd like to -- if need be, I'd like
18 to -- in support of that, I'd like to give you a copy of the
19 officer's testimony -- his police report saying why he
20 kicked in my door. It's -- he kicked in my door mainly for
21 -- for one reason: That -- that he was told by officers
22 that -- that I had threatened to kill myself and that --
23 yeah, that I had threatened -- that I barricaded myself in

## 18

1  my house and that I had threatened to kill myself, and no
2  other -- that -- that never happened and there's -- there's
3  -- there's nothing -- and I have every police report here,
4  and there is no -- no police report backing that statement.
5  And -- nor did I tell anybody that I was going to kill
6  myself. And they never -- and his own police report says
7  that he never spoke to me, that any of the officers never
8  spoke to me regarding that, so it's no way possible that I
9  could have told them that I was going to kill myself. They
10 made up this here false -- false -- false statement to kick
11 in my door. That would be Officer Unger's -- Unger's
12 warrant.
13     I gave you a copy of discovery that the
14 prosecutor gave me. If you look at Officer U-N-G-E-R,
15 Officer Unger's statement why he kicked in my door, you'll
16 find that he said he was told by other officers that I had
17 threatened to kill myself or harm myself and that I was
18 walking around with a knife. This is -- and if you look at
19 the other officer's statement, they was looking at my window
20 the whole time, so there's no way they could have believed I
21 was walking around with a knife when they was -- when they
22 -- when all these officers was looking in my windows and
23 things, it was impossible for them to believe that I had

## 19

1  harmed -- threatened to harm myself or that I had a knife.
2  Those are all false statements that -- to falsify a
3  reasonable grounds kick -- kick in my home door.
4      And had they went and got a warrant and said,
5  "Hey, we got a warrant, we want you to open the door, we're
6  going to kick it in," I would have opened the door and let
7  them in because I knew for a fact that I had -- that I had
8  not committed any offense. But I knew, also, that I wasn't
9  going to open the door because they was -- they was hostile
10 and that they -- that is was going to lead to them -- it was
11 going to lead to issues like resisting arrest or something
12 -- they was going to make up some kind of offense and they
13 was threatening, so I didn't open my door.
14     THE COURT: All right. Do you have other
15 arguments that you'd like to make besides the Motion to
16 Suppress argument that you just made?
17     MR. JOHNSON: Yes. I'd like to -- I'd like to --
18 I entered my plea of not guilty by reason of incompetency
19 and insane. At the time of this offense, I was on -- I take
20 100 milligrams of Seroquel, which puts me out each night.
21 Due to the -- I hadn't been in any conflict or anything
22 prior to that date. And it was just so much going on at
23 that time, that I -- I -- went and took six --

## 20

1  600 milligrams of Seroquel which would -- totally put me in
2  incompetent situation, while I was not -- and I intend to
3  use four -- I need discovery from the prosecutor. I need
4  discovery from the prosecutor regarding that, that medical
5  -- they had my stomach pumped. And I have the officer's
6  statements of my -- how long I stayed unconscious. I gave
7  you a copy of their warrants in discovery that the State
8  gave me. In all of their -- in all of their statements,
9  they said that -- that when they visit me in the hospital,
10 that I was knocked out, that I was un -- that I was
11 unconscious the whole time. I was unconscious even when
12 they kicked in my door. I -- I tried to listen to what they
13 said and everything like that, but I -- I was -- I was not
14 competent at the time of this offense.
15     As far as -- as far as he -- even the charges
16 itself, this -- this offensive touching he's accusing me of,
17 bumping the officer. I didn't resist the arrest. I bumped
18 the officer after the officer attacked me to take me down
19 for a -- for an arrest, or detention, or whatever their
20 intent was at that time. I don't even know they had
21 intended to arrest me at that time. Maybe -- I wasn't sure
22 they had a full investigation of enough information to even
23 make an arrest. But that taken down -- the first offense

## 21

1  he's talking about is an offensive touching where an officer
2  took me down to the ground.
3      Now, the officer asked me to stand up and, then,
4  in his own police report he sits there and say that I -- I
5  couldn't move, or I wouldn't move, or I couldn't move. Of
6  course, I couldn't move. I was not only -- I was on --
7  under 400 -- 600 milligrams of Seroquel. I couldn't even
8  stand up, but I did because he commanded me to stand up.
9      THE COURT: Are you suggesting that you want to
10 raise an insanity defense?
11     MR. JOHNSON: Yes, that's going to be one of my
12 -- that's going to be one of my defenses. That's going to
13 be one of my defenses. And the other -- other defense is
14 the exclusionary rule because they illegally kicked in my
15 house without a warrant or search warrant. Those are going
16 to be my two defenses regarding the officers' charges, along
17 with innocence of the charges. I mean, I'm -- I'm also not
18 only -- I didn't -- it's not the fact only that I was not
19 competent, it's the fact that I didn't even do it. This
20 officer, they -- they attacked me.
21     In their own police report, they're telling you
22 -- this man is accusing me of resisting arrest when he --
23 and then he backs it by saying that four -- it was six

## 22

1  officers on top of me. Now, he wants -- and, then, he wants
2  me to move my hand around to my back, when he just said --
3  when he just contradicted hisself, that it was officers
4  holding my hand -- me down, hand, foot and body.
5      If -- if -- I want -- really, what I want, an
6  opportunity, is to address these issues with the -- with the
7  State and have the State respond to -- to defend whether or
8  not I'm right or wrong on these issues regarding --
9  regarding whether my competency at the time of the offense,
10 because I'm saying, in their own police report, they said
11 that I wasn't competent.
12     THE COURT: All right. The things that you've
13 raised so far are the question of suppression, your intent
14 to rely on an insanity defense, and toward that end, you
15 need discovery of medical reports. And you've also argued
16 that you are not guilty as a matter of fact.
17     MR. JOHNSON: Yes. And, your Honor, I'd like a
18 hearing, a hearing before trial. This is --
19     THE COURT: Yes, a hearing on what?
20     MR. JOHNSON: To -- on -- a hearing to -- to
21 eliminate the -- the charges that -- that's not going to
22 make any progress.
23     For -- I got the -- I got the -- the -- are the

## 23

1  Attorney General -- I got Mr. Vella's discovery information,
2  where he -- he -- he asks to Michelle to contact him May 12,
3  2005. Michelle was not at that address. That was not
4  Michelle's address in the first beginning. He don't have an
5  address for Michelle Roebuck. So, I want to eliminate
6  Michelle Roebuck's charges prior to trial to prepare for
7  issues that are going to be relevant for trial, when he
8  already knows he don't have a victim, and he already knows
9  he's not going to win on -- on the issues regarding Michelle
10 because Michelle is not going to be at trial. Michelle is
11 not even from the state. I paid her way here temporarily to
12 visit me, and she's gone back to -- to -- out of state.
13     THE COURT: All right.
14     MR. JOHNSON: If I can eliminate the charge
15 relating to her, I can -- we can -- we can go forward with
16 the charges relating to the officers' charges.
17     THE COURT: All right. I follow you on that.
18 Anything else?
19     MR. JOHNSON: And there's one -- and I'd like to
20 -- I'd like to slowly -- slowly try -- and not only
21 eliminating Michelle charges, I'd like to eliminate at least
22 one or two of the other charges, based on -- on the fact
23 that the police -- the police officers, police report says

## 24

1  that I didn't even commit the offense. This man -- this
2  Andrew -- Officer Alfree is -- he's -- he's a person that's
3  sitting back, looking at situations and naming charges out.
4      Now, he says sitting back saying that I tried to
5  hit Corporal Simpson with my -- he' accusing me of offensive
6  touching, that I hit Corporal Simpson with my chest.
7  Corporal Simpson -- so that would be offensive touching.
8  But Corporal Simpson's police report plainly says that I
9  attempted to hit him. I'm not accused of attempt. I'm
10 accused of offensive touching with my body, trying to hit
11 him chest to chest. That would eliminate -- based on
12 Corporal Simpson's own police report, it would eliminate the
13 charge of offensive touching.
14     And any charge that -- there may be -- I got it
15 all written down, what each officer's statement is saying --
16 contradicting what Officer Alfree is saying. He's saying
17 I'm resisting arrest at times, where other officers are
18 saying he -- and I'd like to eliminate Officer Alfree's one
19 offense. He gets me with a resisting-arrest charge for not
20 listening to his command. But I got a police report -- I
21 got the police report, saying that it was five officers in
22 front of him giving commands. And he himself says that --
23 he himself says that I listened to Officer Simpson, which I

25

1  did. He told me to stand up, while they was telling me --
2  some said, "Get on the floor." Some said, "Stand up." Some
3  said, "Put your hands behind your back." Some said, "Show
4  your hands." And I said -- I looked at Officer Simpson and
5  said, "What do you want me to do?" He says, "Stand up."
6  That's what I did.
7      So, I mean, he -- everything's contradicting that
8  -- that -- all the evidence of the police reports itself is
9  leading to the fact that there is no -- that there was no
10 resisting -- as a matter of fact, resist arrest, he's
11 accusing me of resisting arrest by not obeying his order, an
12 order to put my hand behind my back when he cut -- when all
13 the other officers, him and the other officers are all
14 saying that he was not the person in charge.
15     Am I getting anywhere with that, what -- are you
16 understanding where I'm coming from?
17     THE COURT: Right now, what I'm trying to do,
18 Mr. Johnson is, is to get you to finish telling me the
19 things you think need to be considered before trial. You've
20 given me a list of them so far, including now, several
21 times, you've told me that you're able to demonstrate that
22 you're not guilty, that the State doesn't have the evidence
23 that it needs to get a jury to find you guilty.

26

1      Is there anything else on the list of things?
2      MR. JOHNSON: I'd like to -- this is not my
3  exclusionary hearing. Like I said, I'd like a hearing to
4  exclude some of the charges prior to going before the jury.
5      THE COURT: Right.
6      MR. JOHNSON: By -- if the officer is telling me
7  that I -- I'm being accused by an officer who's saying I
8  committed offensive touching. But the actual officer who
9  the offense -- who -- who -- that it's claimed that I
10 offensively touched is saying himself that I did not
11 offensively touch him. It seems --
12     THE COURT: Anything else?
13     MR. JOHNSON: If I can get an exclusionary
14 hearing, then, to -- a hearing to eliminate -- elimination
15 hearing, then -- I can put forth evidence to show them that
16 -- that it would be almost practically impossible to get a
17 conviction, or I can ask the Court for a dismissal of the
18 charges based on lack of evidence.
19     THE COURT: Anything else?
20     MR. JOHNSON: Yeah, I also -- I want -- I want --
21 like -- the part -- I guess I already said that, I want a
22 hearing to eliminate the charges of Michelle Roebuck.
23     THE COURT: That's right, you've said that.

27

1  Please don't repeat yourself. What else?
2      MR. JOHNSON: All right. I need -- I need -- I
3  want -- I want -- I got some discovery I want, extra
4  discovery I want the State to provide.
5      The State says that they were called -- the
6  officer -- the State is claiming that the officers was
7  called to -- to a domestic violence involving a knife. So,
8  I'd like -- I'd like the 911 transcripts of that call,
9  saying that -- that they was called regarding the knife.
10     THE COURT: All right. That -- that is mentioned
11 in the motion that you filed on April 3, and that's -- those
12 are things that I have to deal with now.
13     Other than what's in the motion that you filed on
14 April 3, is there anything else?
15     MR. JOHNSON: Yeah, this is -- this is in there,
16 too.
17     I want to understand why I -- why I went to Court
18 of Common Pleas several times and why I went to this court
19 over a couple times, asking for preliminary hearing
20 transcripts when -- I mean, I want the preliminary hearing
21 transcript because that -- that holds evidence --
22     THE COURT: Mr. Johnson, I have to cut you off.
23 Like I said a moment ago, you asked for a copy of the

28

1  preliminary hearing transcript in the motion you filed on
2  April 3.
3      MR. JOHNSON: Okay.
4      THE COURT: And I'll deal with that.
5      MR. JOHNSON: Yes, sir. I'm -- I'm --
6      THE COURT: Is there anything else besides what
7  we've already discussed and what you've indicated in your
8  April 3 motion, which includes the 911 call, the preliminary
9  transcript record, the medical records -- we've talked about
10 them already, or at least you did -- and photographs taken
11 by the police?
12     MR. JOHNSON: Yes, sir. That --
13     THE COURT: What else?
14     MR. JOHNSON: That will wrap it up for me.
15     THE COURT: All right. Thank you. Have a seat.
16 Let me turn to the State now.
17     With respect to the suppression of evidence, the
18 Court already appreciates that the same motion was filed on
19 January 19, 2006, and that it was denied in a summary order
20 by another judge on February 23. So, the motion to suppress
21 has already been denied once.
22     But having said that, let me ask you, Mr. Vella,
23 what -- quickly, what is the basis for the search here?

## 29

1    MR. VELLA: It seems to me, without a record,
2  that the basis for going in was a -- a public-safety
3  exception, exigent circumstances exception.
4       THE COURT: And --
5       MR. VELLA: They were called to a crime scene
6  where there's a guy barricaded inside, possibly overdosed
7  with pills.
8       THE COURT: Do you have a police report and so
9  forth that outlines that?
10      MR. VELLA: Sure.
11      THE COURT: Could you send it up?
12      MR. VELLA: I'm sorry, the only copies I have in
13 front of me are redacted, but I will give you the relevant
14 ones.
15      MR. JOHNSON: Your Honor, I'd like to speak for
16 one second, if you -- if you don't mind.
17      THE COURT: I'm going to try this, Mr. Johnson.
18 But one of the things that we're going to establish is the
19 ground rule that you speak; other people speak; if
20 necessary, you get an opportunity to reply.
21      And the history of this case has been pretty
22 free-wheeling in terms of motions being filed, appeals being
23 filed, motions while appeals are filed, writs of habeas

## 30

1  corpus being asked for while appeals are pending and motions
2  are pending. And it creates a real administration-of-
3  justice problem, to be trying to deal with things coming
4  different directions at the same time. So, I'm willing to
5  hear what you're saying now. But if this takes us off into
6  another direction from what the Court's trying to do, we may
7  not -- we may not do this differently.
8       Go ahead. What do you want to say?
9       MR. JOHNSON: I think that I haven't had an
10 opportunity -- the State denied me numerous motions without
11 the opportunity to hear any -- they don't even know what the
12 State -- like, you're just asking him, this case has been
13 going on practically a year, and this is the first time he's
14 been able to answer to why the officers kicked in my door.
15 And that denial came before the State even answered it. So,
16 I think I -- I asked for it -- I think I asked for a
17 reconsideration.
18      I do got one pending motion in the Court. It is
19 a reconsideration based on the fact I have no finding of
20 fact and conclusion of law why my -- why my motion was
21 denied to suppress the evidence of the officers or the
22 officers' charges due to the fact they broke in my house
23 illegally. I think that they should have waited until the

## 31

1  State answered which, now, the State gives a response which
2  I would have been able to rebut which didn't never happen.
3  So, I'm asking the Court -- regardless of what the prior
4  judge said, since the judge never gave a finding of fact and
5  conclusion of law in support of the their order, I think
6  this: That -- that a judge, okay --
7       THE COURT: I hear you, Mr. Johnson.
8  Mr. Vella -- have a seat, Mr. Johnson.
9       Mr. Vella, on the one hand, even in his argument,
10 -- by the way, it is a reason why he's representing himself,
11 Mr. Johnson's representing himself, why it's a bad ideas.
12 But in the process of arguing his motion, he's basically
13 conceded that there were exigent circumstances. On the one
14 hand, he's saying that he was so mentally ill and under the
15 influence of drugs at the time of the search, that he really
16 didn't know what was going on, which supports the police
17 breaking in for his own protection; and, then, on the other
18 hand, he says there's no reason for the police to break in.
19 I hear all of that.
20      But the fact of the matter is, he asked several
21 times now for a motion to suppress the fruits of the search
22 which the State obviously intends to base on exigent
23 circumstances. The order denying the motion to suppress is

## 32

1  summary without explanation. I'm inclined to order a --
2  that a suppression hearing be held in the near future and
3  you can bring in your officers.
4       Now, I suppose, when I talk about the request for
5  a preliminary hearing transcript, that might solve the
6  problem. But for the fact that Mr. Johnson is representing
7  himself, if another attorney had said, "The police broke
8  into my client's house and that's how he got into trouble,"
9  wouldn't they get a hearing, where the officer would come in
10 and say, "Here's what we did, here's why," and that person
11 would be cross-examined?
12      MR. VELLA: Yes. But in those cases, the relief
13 requested is to suppress evidence.
14      THE COURT: Okay. Keep going.
15      MR. VELLA: This is not -- this is not a claim
16 upon which the Court can grant relief. It's quite simple.
17 He wants his arrest and charges suppressed. That's like
18 saying.
19      THE COURT: How did you get a weapons offense
20 against Mr. Johnson?
21      MR. VELLA: We did not receive the weapon into
22 evidence based on -- well, strike that, because I don't
23 know.

33

The weapons offense has nothing to do with what happened inside. The weapon offense is something that happened inside with the police. This happened -- the police were called because he held his girlfriend at bay with a knife.

Now, the facts can't -- the State would suggest that the facts and testimony can't be suppressed. We don't have a defendant's statement we're looking to suppress. There's no physical evidence that I can think of that we're looking to -- that will suppress that result because there was a search of the home. He's looking --

THE COURT: All right.

MR. VELLA: The State would suggest that he's essentially looking to get everything that happened after the door was kicked in, get any charges that he garnered dismissed because the entry was illegal. And the State would just like to take things to the extreme because it makes the point, I think, more obvious.

If the police had broken into his home -- I say broken into his home. If they had violated his constitutional rights and he chose to shoot one of them, we're not going to suppress the dead body of the police officer, the bullet that's found in his head, and we're not

34

going to dismiss a murder charge on him.

What happens is, the police breached the door.

THE COURT: I need to know, from the point that the police go into the house -- and we'll assume, then, for purposes of this argument that the police broke in without cause.

MR. VELLA: Okay.

THE COURT: All right? And, then, what happens?

MR. VELLA: He resists arrest and he's arrested. And as far as recovering --

THE COURT: And if the police break into someone's house without justification, you say there's a rule of law that is to the effect that the police -- someone cannot resist an unlawful arrest?

MR. VELLA: That is correct.

THE COURT: All right, go ahead. What's next?

MR. VELLA: A person is not entitled to further break the law or resist and unlawful -- even an unlawful arrest. Our statute says that. And the State would suggest, if you take that logically, it doesn't mean he's entitled to commit other crimes which will get dismissed merely because the police are present --

THE COURT: How do we try these issues in front

35

of the jury?

MR. VELLA: I don't think they get tried in front of a jury. Those are truly legal issues. And I think -- because he's representing himself, it creates an issue and a problem, because he's going to try and put that stuff in front of the jury and say it was unconstitutional. And even if the Court is to determine -- my guess is, even if the Court is to determine that they were constitutionally permitted on the premises, he's still going to argue that to the jury.

THE COURT: All right. Meanwhile, so you say that the police break in, and for purposes of argument, they've done it illegally, he confronts them, and there's an altercation, and that generates offensive touching and I think a resisting-arrest charge or two.

MR. VELLA: That is correct.

THE COURT: What's next?

MR. VELLA: In terms of what?

THE COURT: The trial.

MR. VELLA: The trial, the officer's testimony about the events.

THE COURT: Is that when they found the weapon?

MR. VELLA: Your Honor, honestly, I don't know

36

when they found the weapon.

THE COURT: When do you think you might find out what your case is, considering the fact that it was indicted over a year ago or roughly a year ago and the arrest happened in April of 2005? Do you think that maybe it's time for the State to be able to speak?

You know, I'm being pointed because Mr. Johnson is filing papers right and left. The Court is spending a lot of time dealing with those papers.

Now, if the State isn't interested enough in this prosecution to get on board with the case, the Court's not going to keep wasting its time over something that's not important to the State.

MR. VELLA: The State.

THE COURT: Do you see the position that the Court's in right now?

MR. VELLA: The State sees the position that the Court is in right now.

THE COURT: Do you think you're being helpful to the Court?

MR. VELLA: The State is trying to be helpful to the Court. And I would assume that the weapon was recovered after the police entered. I, unfortunately, am not

37

1  completely conversant in the facts of the case. If this
2  were my only case, and I was sitting around 24 hours a day,
3  I'd know it. But I don't. Because Mr. Johnson has had that
4  opportunity. The Court has other things on its plate, as
5  does the State, and this has taken up a lot of Court's time,
6  and I appreciate that. This has taken up a lot of State's
7  time, as well.
8      So, I apologize to the Court if I do not know the
9  one detail that the Court is looking for.
10     THE COURT: With respect to the suppression
11 question, the Court will schedule a hearing sometime before
12 the end of this month --
13     MR. JOHNSON: Thank you.
14     THE COURT: -- on suppression. And the question
15 with respect to suppression is the basis for the police
16 entry into the premises. If there were exigent
17 circumstances, then the State's argument that there is no
18 evidence to be suppressed, frankly, becomes moot. Moreover,
19 if the Court can determine as a matter of fact, based on an
20 evidentiary hearing, that the -- I'm sorry, that the search
21 was lawful, then it will have an impact on the way the trial
22 will proceed and what instructions will be given to the jury
23 on the issue. And that may be a very helpful thing in terms

38

1  of avoiding confusion at trial, if you follow me, Mr. Vella.
2      MR. VELLA: I do.
3      THE COURT: So, we'll have a suppression hearing.
4  And I assume that you'll have one of the officers who went
5  through the door available to discuss that.
6      MR. VELLA: I will.
7      THE COURT: Mr. Johnson, with respect to your not
8  guilty by insanity, Rule 12.2, Criminal Rule 12.2, requires
9  a written notice by you. Arguably, the Court could consider
10 the motion as untimely. You have until the end of this week
11 to file your motion, saying that you're going to try and
12 demonstrate --
13     MR. JOHNSON: I filed one already.
14     THE COURT: When did you file it.
15     MR. JOHNSON: It's dated 3/21, 2006, but I had
16 already filed it. I filed all this stuff upon arrest, for a
17 suppression hearing, upon arrest.
18     THE COURT: The Court needs a response to the --
19     MR. VELLA: I have everything that he sent, and I
20 haven't seen that in my stack of papers.
21     MR. JOHNSON: It's only a one-page -- he can have
22 this copy. He can get a copy of it.
23     Your Honor, can I -- could I please --

39

1      THE COURT: No. What are you waving, Mr. --
2      MR. JOHNSON: This is the motion -- this is -- I
3  gave you a copy of --
4      THE COURT: You said your motion was filed on
5  March 21; right?
6      MR. JOHNSON: Yes. I got that. But I had --
7  prior to now, I had asked you to enter in this fruit-of-the-
8  poisonous tree doctrine, exclusionary-rule doctrine in
9  support of *Mapp v. Ohio*.
10     THE COURT: Mr. Johnson, stop talking to me about
11 fruits of the poisonous tree. We're going to have a
12 suppression hearing. That's what fruits of the poisonous
13 tree are about.
14     And with respect to -- the docket shows that
15 there was a filing made on March 21, and it's a motion for
16 reconsideration.
17     MR. JOHNSON: Okay. I filed a notice of writ
18 pleading to the Court -- to the charges of the case. I did
19 file that, and that's only one page. I filed that on 3/21,
20 2006, and I sent the State a copy.
21     THE COURT: With respect to the medical reports,
22 which supposedly would support the insanity defense that has
23 or has not been asserted, or will or will not be asserted,

40

1  what does the State know about the medical reports? I think
2  these are on Mr. Johnson from the time of his arrest?
3      MR. VELLA: That's correct. I have them. I've
4  not thoroughly reviewed them. I wanted to see what he had
5  his stomach pumped with, and, honestly, I don't remember.
6      THE COURT: Well, they're his medical records. I
7  see no harm in saying --
8      MR. VELLA: I'm happy to --
9      THE COURT: By the end of the coming week, would
10 you send them down to Mr. Johnson?
11     MR. VELLA: Yes.
12     THE COURT: With respect to all of the claims
13 that Mr. Johnson has made to the effect that the paperwork
14 that's been submitted so far demonstrates on its face that
15 he is not guilty, I assume, Mr. Vella, having been through
16 these sorts of things so many times, that regardless of what
17 the paperwork says, the State believes it has witnesses who
18 will come to Court --
19     MR. VELLA: That is correct.
20     THE COURT: -- and testify under oath in a way
21 that would support all of the charges that are pending
22 against Mr. Johnson?
23     MR. VELLA: That is correct.

**41**

1  THE COURT: Mr. Johnson, that's what your trial
2  is all about. If you've got statements by State's witnesses
3  that support the idea that they've already said things that
4  prove that you're not guilty, or undermined the jury's
5  ability to find you guilty, that's what the trial is for.
6  But the Court has no mechanism for sorting through evidence
7  before trial to decide whether the State has evidence that's
8  going to be impeached -- that is, contradicted -- by trial
9  testimony or pretrial statements and testimony and so forth.
10 And, so, all the motions that are pending that are based on
11 the idea that the paperwork shows that defendant, as a
12 matter of fact, is not guilty of these charges, those
13 motions are all denied without prejudice. That's what the
14 trial is for.
15      With respect to the charges concerning Michelle
16 Roebuck, they fall under the ruling that the Court just
17 made. But let me ask Mr. Vella.
18      Does the State expect to have Miss Roebuck here,
19 or, will the Court be throwing those charges out on the day
20 of trial? Mr. Johnson makes, as a practical matter,
21 something of a point, that he really should not be forced to
22 prepare with respect to Michelle Roebuck if the State knows
23 now that those cases are not going to proceed to trial.

**42**

1  Am I getting this right, Mr. Johnson?
2      MR. JOHNSON: Yes, sir.
3      THE COURT: All right. Then, what's the State
4  say about that?
5      MR. VELLA: Our social worker had early contact
6  with her in the case. We have not had since. Whether she
7  shows up is a risky proposition. But State is not willing
8  to nolle pros the charges ahead of time because it is too
9  often that victims break off contact with us and then show
10 up on the day of trial.
11      THE COURT: Well, the question that that raises
12 -- and, of course, you make an obvious point. But the
13 question that it raises is, does the State at this point
14 have reason to believe that it can contact her for purposes
15 of a subpoena and, if it does not have that information now,
16 when will it? You follow me?
17      MR. VELLA: I follow you. I follow you.
18      THE COURT: She's not going to appear at trial if
19 nobody's ever told her that the trial is --
20      MR. VELLA: Correct. And I know that we have
21 sent to her last-known address a trial notice. We do that
22 routinely. Whether that last-known address is correct, we
23 have no idea.

**43**

1  THE COURT: And they haven't been returned,
2  claimed no --
3      MR. VELLA: No, they have not been returned. As
4  far as we know, we're sending our stuff -- our
5  correspondence to the correct address.
6      Now, what I would normally do in a case like this
7  is send the chief investigating officer out a week or two
8  ahead of time, just in case we haven't heard from that
9  victim, and if we find out they have moved, we try and track
10 them down, night by night, day by day.
11      THE COURT: You understand that it is very
12 unlikely that the Court will continue this old case because
13 Miss Roebuck fails to appear on the day currently scheduled
14 for trial?
15      MR. VELLA: Absolutely. The State has clear
16 understanding of that. We appreciate the Court -- the
17 position that the Court is in with an old case like this.
18      THE COURT: The most I can do, Mr. Johnson, is
19 what I've done. I can lean on the State to try and
20 determine sooner, rather than later, whether its victim,
21 complaining witness will appear at the trial. But unless
22 the State has information right now, regardless of what you
23 think, that demonstrates that she is not going to appear,

**44**

1  then the Court has to wait and see if she appears on the day
2  of trial. The best I can do is encourage the State to let
3  you know about it sooner rather than later.
4      And I've also told the State that it's on notice
5  that it's unlikely that this case will be continued if she
6  does not appear on the day of trial. But that's pretty much
7  what the Court can do about that, Mr. Johnson. And --
8      MR. JOHNSON: May I ask, please --
9      THE COURT: This will probably be the last time
10 that you and I will speak -- wait a minute, let me finish
11 one more thing and then you can talk one last time.
12      With respect to the 911 phone call of the victims
13 and/or witnesses, we may be able to address that at the
14 suppression hearing. If the police acted in response to a
15 911 call, it would be interesting to know about that. And
16 the first thing State has to do, obviously, do you have the
17 911?
18      MR. VELLA: I did not subpoena it, assuming it is
19 still in existence.
20      THE COURT: Exactly. So, we need an affidavit
21 from somebody with respect to that.
22      I've been told in many cases, Mr. Johnson, that
23 if the tapes are not requested by either the State or the

45

1  defense within a certain amount of time, then they just use
2  the tapes over again and the recordings disappear. I'll
3  require State to present an affidavit if the tape is gone.
4  If it's not gone, then the State should produce the 911
5  tape, or a transcript of it, or both, actually. But if the
6  tape's gone, it's gone. All I can do is find out whether
7  the tape is gone or not.
8      As to the copy of a transcript of the preliminary
9  hearing on April 22, most likely, my understanding is that
10 probably the arresting officer would have testified at the
11 preliminary hearing, would have told his version of what
12 went on. It may be a constructive thing. The Court will
13 order that.
14     We've talked about the medical records from the
15 Christiana Hospital. The State's going to turn them over.
16     And, finally, with respect to the pending April 3
17 motion, the copy of photographs taken by Officer Price, do
18 you have photographs, Mr. Vella?
19     MR. VELLA: The officer has them in evidence. I
20 don't have them in my file, but we can get copies of them
21 once I contact --
22     THE COURT: All right. So, the State will turn
23 them over. The State's turning over the medical records.

46

1  The Court's ordering a transcript of the preliminary
2  hearing. And the State will present something formally
3  about the 911 phone call, either a transcript or an
4  affidavit explaining that the tape no longer exists.
5     MR. VELLA: Your Honor, with regard to transcript
6  of 911, what we get is the tape and a printout. We don't
7  get a transcript. But whatever we can get from them, we'll
8  get from them. I'm just letting the Court know.
9     THE COURT: All right. Let's cross the bridge if
10 we come to it.
11     I'm guessing, Mr. Johnson, based on my
12 experience, that we're going to find out that there is no
13 tape. I could be wrong, in which case, we can see what they
14 have.
15     What's the last thing you want to say?
16     MR. JOHNSON: I was going to ask about -- I was
17 looking at the State's last time, according to their
18 paperwork, that they even asked for Michelle, that was back
19 on May 12, 2005. So, way back in 2005, May of 2005, they
20 knew that they didn't have contact with the State. So, I'm
21 asking for a reduction in bail on those charges relating to
22 Michelle, just the -- the possession of deadly weapon during
23 commission of a felony, unlawful imprisonment, and

47

1  possession of a deadly weapon by a person prohibited. I'd
2  like to -- I'd like a bail reduction to 5,000 -- $5,000 on
3  this whole case.
4     THE COURT: And this is the only thing that's
5  holding you?
6     MR. JOHNSON: Yes, sir.
7     Your Honor, I've been in jail so long, I take
8  back that. I take back that. I'm ready to go to trial and
9  get this over with and start my life a hundred percent free.
10    THE COURT: Well, I think that that makes sense.
11 The trial is going forward in roughly a month, more than a
12 month. And we'll have a suppression hearing probably, give
13 or take a few days, two weeks from now. And we'll get an
14 idea of whether it's likely that the police are going to be
15 able to prove that you were in possession of a deadly weapon
16 at the time of this thing, which would make you probably
17 guilty of possession of a deadly weapon by person
18 prohibited, even if she doesn't show up.
19    MR. JOHNSON: That's not even the charge I'm out
20 to challenging. The only charge I'm out to get excluded was
21 the re -- two resisting-arrest charges and two
22 offensive-touching charges. And the other charges, they
23 never -- they never saw a witness -- there's nobody going to

48

1  testify. They got nobody, not even Michelle Roebuck, that's
2  going to testify that I even had a knife and the knife they
3  got, they did get a knife. They -- this -- we'll deal with
4  that at that time, like you said.
5     THE COURT: So --
6     MR. JOHNSON: The rest of the officers -- the
7  rest of the charges are going to be dismissed because
8  Michelle is not going to show up. And, plus, my family and
9  them, and my friends, she wanted to come -- I filed a motion
10 to suppress, to get -- to separate the charges because she
11 wanted to come to testify for me that none of this never
12 happened, that she never even told the officers that. So,
13 that was -- that was --
14    THE COURT: All of that may be as you say,
15 Mr. Johnson. I don't know. But from what I've seen, and
16 what I'm suspecting, if she doesn't show up, that takes care
17 of the unlawful imprisonment and the possession of a deadly
18 weapon during the commission of a felony. And it's going to
19 leave the offensive touching, the resisting arrest, and the
20 possession of a deadly weapon by a person prohibited
21 charges.
22    But I don't know. We'll see where it stands. I
23 will order that -- we'll try and set up that suppression

```
                                               49
1   hearing in the not-too-distant future.
2           And that takes care of today's matters. It's
3   20 minutes after 1:00. I have a 1:15 sentencing calendar
4   based on the hearing we just concluded. We'll take a
5   recess. I'll try to be in as close as 1:30 as I can to do
6   the 1:15 sentences.
7           MR. JOHNSON: Thank you, your Honor, for your
8   help.
9           (Hearing concluded.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

                                               50

CERTIFICATE OF COURT REPORTER

I, Lynne B. Coale, Registered Diplomate Reporter and Certified Realtime Reporter, Official Court Reporter of the Superior Court, State of Delaware, do hereby certify that the foregoing is an accurate transcript of the proceedings had, as reported by me, in the Superior Court of the State of Delaware, in and for New Castle County, in the case herein stated, as the same remains of record in the Office of the Prothonotary at Wilmington, Delaware.

WITNESS my hand this 22nd day of May, 2006.

Cert. # 165-PS



Lynne Ball Coale / RDR, CRR
Official Court Reporter